Willoughby v. Chicago Junction Railways &c. Co.

CHARLES L. WILLOUGHBY, ROYAL E. ROBBINS, EDWIN G.
FOREMAN and OSCAR G. FOREMAN

*v.*

THE CHICAGO JUNCTION RAILWAYS AND UNION STOCK-
YARDS COMPANY, PHILIP D. ARMOUR, JONATHAN O.
ARMOUR, PHILIP D. ARMOUR, JR., and GEORGE H. WEB-
STER, individually and as co-partners composing the firm
of Armour & Company; NELSON MORRIS, FRANK E.
VOGEL and EDWARD MORRIS, individually and as co-
partners composing the firm of Nelson Morris & Company;
GUSTAVUS F. SWIFT, EDWIN C. SWIFT, LOUIS F. SWIFT
and EDWARD F. SWIFT, the corporation of Swift & Com-
pany; THE UNION STOCKYARD AND TRANSIT COMPANY,
FREDERICK H. WINSTON, FREDERICK H. PRINCE,
CHAUNCEY M. DEPEW, JOHN QUINCY ADAMS, EDWARD
J. PHELPS, WILLIAM J. SEWELL, HUGH C. E. CHILDERS,
FRANCIS BARRON BLAKE, BERNARD T. BOSANQUET,
ADOLPH VON ANDRE and JOHN REEVES ELLERMAN.

1. E., a stockholder in the defendant corporation, filed a bill in this court
to enjoin the consummation of an agreement made by the said company
with certain parties, in which suit the company appeared and answered, and
the cause was regularly heard and decided. W., another stockholder in the
same company, afterwards filed a bill to prevent carrying into effect the same
agreement. Subsequent to the filing of the latter bill, a new agreement was
made by the company with the same parties, which, while it contained many
of the provisions of the former agreement, expressly annulled it. W. then
filed a supplemental bill seeking to restrain the carrying into effect of the last
agreement.—*Held* that, in the absence of fraud or collusion in the suit by E.,
the decision of questions in issue in that suit was conclusive, as to similar
questions in the suit by W., as against the company and its stockholders, and
further that the charge of collusion made to impeach the decree in the suit
brought by E., was not sustained by the records or evidence.

2. The question whether or not the defendant corporation could acquire,
and lawfully exercise, all the powers declared in its certificate of incorpora-
tion, especially whether it could lawfully own the stock of another corpora-
tion, is one that a stockholder, in a suit which he is only permitted to prose-
cute in behalf of the corporation and for its benefit, cannot raise, and which

Willoughby v. Chicago Junction Railways &c. Co.

can only be presented for judicial determination by the attorney-general on behalf of the state.

3. It being alleged that the agreement attacked was illegal, as creating an unjust discrimination in violation of the statute of Illinois, which it was claimed controlled the transaction, and that the same violated the provisions of the Interstate Commerce act, and also the law of the United States with reference to trusts—*Held*, that the provisions of the agreement were not in violation of such laws.

4. The defendant corporation being authorized by charter to issue bonds for proper corporate purposes, and the validity of the contract being established, this court will not interfere to regulate the character of the payments, or of the instruments to be issued therefor, as long as the same are not expressly unauthorized.

On rule to show cause why an injunction should not issue. Heard on bill, supplemental bill, answers and affidavits, and on subsequent stipulation that the cause should be disposed of as having been heard on final hearing.

*Mr. Aaron P. Whitehead, Mr. Frederic W. Stevens* and *Mr. Thomas N. McCarter,* for the complainants.

*Mr. R. Wayne Parker, Mr. Cortlandt Parker, Mr. Joseph H. Choate* and *Mr. William D. Guthrie* (of the New York bar), for the defendant corporation.

*Mr. Barker Gummere,* for the defendants Armour, Swift and Morris.

GREEN, V. C.

For convenience, the designations of the respective parties used by counsel are herein adopted, as follows:

The Chicago Junction Railways and Union Stockyards Company, as "The New Jersey Company."

The Union Stockyard and Transit Company of Chicago, as "The Chicago Company."

Armour & Company, Nelson Morris & Company and Swift & Company, as "The Associate Packers;" other parties located and operating their plants in the vicinity of the stockyards of the Chicago Company, as "The Non-Associate Packers."

42

The original bill was filed December 17th, 1891, by Charles L. Willoughby, on behalf of himself, as a stockholder in the New Jersey Company, and all other stockholders therein, who should come in and contribute to the expense of the suit; and Royal E. Robbins, Edwin G. Foreman and Oscar G. Foreman were, by an order of the court, afterwards admitted as parties complainant. The New Jersey Company, the Chicago Company, the individual directors of the New Jersey Company, the Associate Packers, and John Reeves Ellerman, are the defendants. The object of the original bill was to restrain the defendants from carrying into execution an agreement, between the New Jersey Company and the Associate Packers, bearing date July 27th, 1891.

An order to show cause why an injunction should not issue, with a restraining order in the meanwhile, was granted on the filing of the bill.

Before the hearing of the order to show cause, another agreement was entered into between the New Jersey Company and the Associate Packers. This contract is dated January 15th, 1892, and although characterized by the answer of the New Jersey Company as a modification of the agreement of July 27th, 1891, yet by its fourteenth paragraph it annulled the previous agreement, and Messrs. Willoughby, Robbins, Edwin G. and Oscar G. Foreman, the complainants, thereupon, by leave of the court, filed a supplemental bill against the same defendants, setting out the fact of the original suit, and as far as proper incorporating the original bill, and seeking to restrain the carrying into effect both the agreement of January 15th, 1892, and that of July 27th, 1891.

Answers were filed by the New Jersey Company and its directors, and by the Associate Packers, and affidavits were presented, under leave, by the complainants and defendants.

John Reeves Ellerman, another stockholder of the New Jersey Company, on the 19th of August, 1891, filed a bill in this court, in behalf of himself, and all other stockholders therein, who should come in and contribute to the expense of the suit, for the purpose of preventing the consummation of the same agreement,

Willoughby v. Chicago Junction Railways &c. Co.

between the New Jersey Company and the Associate Packers, dated July 27th, 1891. The defendants in that suit were the New Jersey Company and the Associate Packers. Answers were filed in the cause and it was regularly upon the calendar for October Term, 1891 ; it was heard before a vice-chancellor on November 5th, 1891, on bill and answers; an opinion was filed December 18th, 1891 (*4 Dick. Ch. Rep. 217*), holding that the said agreement was not *ultra vires* the corporation, and not illegal, and a decree was entered dismissing the bill on that ground. These facts appear by the original bill and answers herein, and by the records of the court.

Assuming that such decree is not impeachable for fraud, collusion or other vice, to what extent, if at all, is the decision of questions in the Ellerman suit conclusive in this action ?

Mr. Black, in his work on *Judgments*, thus states the general rule (§ *504*) :

"A point which was actually and directly in issue in a former suit, and was there judicially passed upon and determined by a domestic court of competent jurisdiction, cannot be again drawn in question in any future action between the same parties or their privies, whether the causes of action in the two suits be identical or different."

The application of the rule in this case is resisted, on the grounds that the parties in the two suits are not the same ; that the present complainants, not having been parties to the other suit, are not concluded by any determination therein, and that the decree in the Ellerman suit is not pleaded as an estoppel. The senior counsel of complainants took the position that all questions were opened anew for discussion, and that the court should be quick to embrace the opportunity to review its former decision, and correct it, if erroneous. Striking examples of such action in this state were cited, but they will be found, on examination, to be cases where justices of the supreme court, when the cases were in the court *in banc*, on rules for new trials, properly reviewed their own rulings, made at the circuit. We have here presented, not a question involving pride of opinion, but one which precedes all investigation in which it could manifest

itself, and that is, whether the court can re-examine the points decided as they are here presented, for if the decision of the questions involved in that suit is conclusive between the parties to this, they are not reviewable here, in a proceeding of this character.

It is urged that the objection has not been properly taken in the pleadings. If the question now to be decided was raised in the original bill, in which the cause of action and relief sought, viz., enjoining the consummation of the agreement of July 27th, 1891, were identical with that of the Ellerman suit, it would, if otherwise tenable, operate as a bar to the action, and, properly, should have been pleaded. But the cause of action in the supplemental bill is based on the agreement of January 15th, 1892, which abrogates the agreement of July 27th, 1891, and the former adjudication is introduced by way of evidence that certain questions now arising have been conclusively settled between the parties. This can be done without setting up the former adjudication in the pleading.

Are the complainants bound by the former adjudication of the questions arising in the Ellerman suit?

As the rule in question is generally stated, the former judgment is binding only on parties and their privies, but the course of decision has been such as to embrace others who do not stand in a relation, strictly speaking, of privity with the original party, as a sheriff and his deputy, *King* v. *Chase, 15 N. H. 9 (41 Am. Dec. 657)*; master and servant, in an action of trespass, *Emery* v. *Fowler, 39 Me. 326 (63 Am. Dec. 627)*; the joint and several makers of a promissory note, *Spencer* v. *Dearth, 43 Vt. 98 ;* the true owner, and the bailee of complainant, *Bates* v. *Stanton, 1 Duer. 79 ;* a chattel mortgagee and the vendee of the mortgaged goods, *Atkinson* v. *White, 60 Me. 396 ;* a town and parties alleged to have caused an obstruction to the highway, in an action for negligence, *Hill* v. *Bain, Town Treas., 15 R. I. 75 (23 Am. Rep. 44)*; see, also, *Durham* v. *Giles, 52 Me. 206 ; Freer* v. *Stotenbur, 2 Abb. Ct. of App. Dec. 189.*

Chief-Justice Durfee, in *Hill* v. *Bain,* referring to some of the cases, says (at *p. 77*):

Willoughby v. Chicago Junction Railways &c. Co.

" In these cases the defendants were permitted to avail them-selves, by way of estoppel, of judgments to which they were neither parties nor privies.   The ground on which this was per-mitted seems to have been that the defendants, though not parties to the judgments, were so connected in interest or liability with the parties that the judgments, when recovered, could be regarded as virtually recovered for them, for the purposes of estoppel, as well as by and for the parties of record."

*Black on Judgments* (§ *537*) thus states the rule as to the parties affected :

" It is not always necessary that the parties to the two suits should be nomi-nally the same in order that one recovery may bar another.   It is in general sufficient if they are really and substantially in interest the same."

And Mr. Freeman, in his work on *Judgments,* thus (§ *154*):

" Persons who were parties to the suit, or in privity with such party, or in such a position that they were the real parties in interest in the litigation con-ducted for their benefit in the name of another, under such circumstances as to make them answerable for the result of the litigation by virtue of the princi-ples to be hereinafter stated."

The practice has long been recognized of permitting suit to be brought by a few as the representatives of a numerous class, on behalf of themselves and all others of the class, when there is a common interest or a common right which the suit seeks to pro-tect, and against a few as representing a numerous class subject to a common liability which the suit seeks to enforce.   *Story Eq. Pl.* § *97.*

" In most, if not in all, cases of this sort, the decree obtained upon such a bill will ordinarily be held binding upon all other persons standing in the same predicament, the court taking care that sufficient persons are before it, honestly, fairly and fully to ascertain and try the general right in contest." *Story Eq. Pl.* § *120.*

In *Harmon* v. *The Auditor, 123 Ill. 122* (*5 Am. St. Rep. 502*), the town of Mount Morris had issued bonds in aid of a railroad company—four resident taxpayers of the town brought suit in

the circuit court against the auditor of the state, the officers of the county, the collector of the town, and the holder of certain of the bonds, praying that the bonds might be decreed null and void, for want of power to issue the same, and to enjoin their collection. Prior to this suit, one Pinckney and certain other parties, resident taxpayers of the town, had filed a bill, in the same court, against the town officers and others, to enjoin the town and its officers from issuing the bonds. The circuit court decreed for the plaintiff; but in the supreme court such judgment was reversed, and it was held that the town had power to issue the bonds. This former suit and judgment were set up in the the latter suit as a bar.

Mr. Justice Magruder, after determining that the judgment in the former suit was conclusive upon the town, says (at *p. 130*): "If this be so, then the complainants, as citizens of the town, cannot, by a proceeding to prevent the collection of a tax to pay the bonds, dispute their validity upon any of the grounds which were or could have been litigated in the Pinckney suit. The law upon this subject is stated in *Freem. Judg.* § *178:* 'A judgment against a county, or its legal representatives, is a matter of general interest to all its citizens, is binding upon the latter, though they are not parties to the suit. A judgment for a sum of money rendered against a county, imposes an obligation against the citizens which they are compelled to discharge. Every taxpayer is a real, though not a nominal, party to such judgment. If, for the purpose of providing for its payment, the officers of the county levied and endeavored to collect the tax, none of the citizens can, by instituting proceedings to prevent the levy or enforcement of the tax, dispute the validity of the judgment, nor relitigate any of the questions which were or which could have been litigated in the original action against the county.' * * * The Pinckney bill was filed by certain property owners and taxpayers, as representatives of a class. Though not formally stating that it is filed on behalf of all the other taxpayers in the town, yet it constantly refers to them and their interests in the questions involved." He then alludes to the different allegations in the bill to show that it was filed on

Willoughby *v.* Chicago Junction Railways &c. Co.

behalf of other taxpayers as well as the plaintiffs in the suit, and proceeds (at *p. 132*): "The present suit was begun by Harmon and others, also taxpayers and property owners of the town, as representatives of the same class for whose benefit the Pinckney bill was filed. The complainants in this proceeding were represented by the complainants in the former suit, and are, therefore, bound by the decree therein entered. The remedy, in suits of the character here indicated, is in the interest of the class of individuals having common rights that need protection, and, in the pursuit of that remedy, individuals have the right to represent the class to which they belong. This jurisdiction in some respects rests upon the principles of a proceeding *in rem.* We, therefore, think that there is sufficient identity between the parties filing the present bill and those who filed the bill in the *Pinckney Case* to justify the pleading of the decree entered therein as *res judicata* in this case."

In *Gaskell* v. *Dudley, 47 Mass. 546,* D. recovered judgment by default against a school district in an action on a contract with the district to build a school-house, and levied his execution on the goods of G., a member of the district, as authorized by the law of Massachusetts. G. sued D. in an action of trespass for so levying on his goods. *Held,* that G. could not give evidence that D. had not performed his said contract, and, therefore, ought not to have recovered against the district.

Chief-Justice Shaw, among other reasons for sustaining the decision below, says: "Besides every member of a corporation is so far privy in interest in a suit against the corporation, that he is bound by the judgment against it," citing *Brewer* v. *Gloucester, 14 Mass. 216,* " as the law provides that when judgment is recovered against the inhabitants of a town, execution may be levied upon the property of any inhabitant, which inhabitant must be considered as a party within the meaning of the statute referred to, when the suit is by or against the town in its corporate capacity."

*Dewey* v. *St. Albans Trust Co., 60 Vt. 1 (6 Am. St. Rep. 84),* was a suit in equity by depositors in a trust company claiming a preference under the statutes of the state. A former suit had

been instituted by others standing in the same right, claiming the same preference, but alleging insolvency of the defendant company on a different ground from that set up in this suit. The former decree was urged as a defence to the latter suit. Mr. Justice Rowell states the practice of the court in permitting a representative of a class which is so numerous that it would be impracticable to make them all parties, to maintain an action in behalf of himself and all others of a class, citing authorities, and proceeds (at *p. 14*):

"But to what extent is the decree binding? Certainly not to the extent of precluding all future inquiry into this matter based upon things that have transpired since the institution of the former proceedings; for the doctrine of estoppel by judgment has no application to a case that is ambulatory in its nature and has ceased to be the same by progression." It was held, that "while the former decree would not be binding as to matters which had transpired since that decree was entered, yet, as it did not appear that the condition of affairs set up in the later petition did not exist at the time of the former suit, that the former decree controlled the later case."

None of these cases, it is true, is exactly in point, but they show clearly how elastic is the rule limiting the conclusive character of judgments to parties and their privies. How does the question stand on principle?

Actions of the class to which the Ellerman and Willoughby suits belong are *sui generis*, in this, that the complainant does not prosecute in his own right—a stockholder, as such, does not have a legal or equitable estate in the corporate property; his only right of property is to a proportionate share of the profits of the business while the company is in operation, and to a proportionate share of the net assets on its dissolution. Unauthorized dealing with the franchises or funds of the corporation directly injure it as a legal entity; it is the franchises of the corporation which are to be misused, the funds of the corporation which are to be misappropriated, and the corporation is, therefore, the party to be injured and should itself seek redress. This class of cases must not be confounded with the preventive remedy

of every stockholder to restrain acts *ultra vires* the corporation. While

"the directors are *quasi* or *sub-modo* trustees for the corporation with respect to the corporate property, they are also *quasi* or *sub-modo* trustees for the stockholders with respect to their shares of the stock." *3 Pom. Eq. Jur. § 1090.*

Each stockholder has invested his money in the very enterprise contemplated by the charter, and has, in his own right, an equitable remedy to prevent his *quasi*-trustees, as directors, from misuse of the corporate franchises, and from diversion of corporate funds, to a purpose foreign to that of the charter, and for which he has invested his money, and this although every other stockholder favors the proposed action, and it is plainly advantageous to the financial interests of the company.

The Ellerman and Willoughby suits belong not to this, but to that class of cases in which the corporation itself is directly injured and is primarily interested, and should itself institute and maintain an action for relief; in which the remedy to be obtained, whether pecuniary or otherwise, is for its benefit and belongs to it alone; the stockholder in such case has no standing in the court, as a party, except on the refusal, either express or implied, of the corporation itself to prosecute.

Where, as in this case, an appeal to the directors to bring suit would apparently be unavailing, refusal to prosecute is implied, and a stockholder is permitted to commence the action in his own name; but otherwise the suit is treated in every respect as one brought by and for the corporation; although the stockholder is the nominal, the corporation is the real party complainant, represented not by its accustomed officials, but by one or more of its stockholders.

Professor Pomeroy (*3 Eq. Jur.* § *1095*) says, with reference to such a suit:

"Wherever a cause of action exists primarily in behalf of the corporation against directors, officers and others, for wrongful dealing with corporate property, or wrongful exercise of corporate franchises, so that the remedy should regularly be obtained through a suit by and in the name of the corporation, and the corporation *either actually or virtually refuses* to institute or prosecute

such a suit, then, in order to prevent a failure of justice, an action may be brought and maintained by a stockholder or stockholders, either individually or suing on behalf of themselves and all others similarly situated, against the wrong-doing directors, officers and other persons; but it is absolutely indispensable that the corporation itself should be joined as a party—usually as a co-defendant. The *rationale* of this rule should not be misapprehended. The stockholder does not bring such a suit because his rights have been directly violated, or because the cause of action is his, or because he is entitled to the relief sought; he is permitted to sue in this manner simply in order to set in motion the judicial machinery of the court. The stockholder, either individually or as a representative of the class, may commence the suit, and may prosecute it to judgment; but in every other respect the action is the ordinary one brought by the corporation; it is maintained directly for the benefit of the corporation, and the final relief, when obtained, belongs to the corporation and not to the stockholder-plaintiff. The corporation is, therefore, an indispensably necessary party, not *simply* on the general principles of equity pleading, in order that it may be bound by the decree, but in order that the relief, when granted, may be awarded to it, as a party to the record, by the decree. This view completely answers the objections which are sometimes raised in suits of this class, that the plaintiff has no interest in the subject-matter of the controversy, nor in the relief. In fact, the plaintiff has no such direct interest; the defendant corporation alone has any direct interest; the plaintiff is permitted, notwithstanding his want of interest, to maintain the action solely to prevent an otherwise complete failure of justice."

*Cook on Stockholders (1st. ed) § 692*, says:

"The rule that the corporation itself is an indispensable party defendant to such suit, is due to the fact that all other possible future suits by the corporation are thereby prevented, the rights of the corporation are duly ascertained, and the remedy made effectual against the corporation as well as others."

Neither this suit nor the Ellerman suit was in the right of the respective complainants; they were the nominal, but not the real, parties complainant. They were suing merely as representing the company, to establish and enforce its rights; the relief to be obtained was not and is not for their individual benefit, but for the benefit of the corporation as such. In these cases the corporation itself is a necessary and was and is actually a party defendant; in these it was and is represented by counsel, answered the bills and has taken part by counsel, in the discussion of the case. The decree in the Ellerman suit certainly binds the company. In the face of that decree, neither the old nor a new board of

directors could attack it except by an appeal.    The former decree
could be successfully pleaded as a bar to an action instituted in
the name of the company by authorized agents who might desire
to relitigate the questions decided.    If the company and its
authorized representatives are then concluded by such a decree,
how can a stockholder, suing in behalf of the company, be per-
mitted to relitigate questions which are conclusive upon the corpo-
ration?    A stockholder has no standing in the court to prosecute
such an action except on the refusal of the directors, either actual
or presumptive, to prosecute.    But such refusal of the directors
to prosecute must be an unjustifiable refusal.    If their reason for
not doing so is a valid one, the individual stockholder cannot,
from such refusal derive a right to prosecute in his own name.
It would not be unreasonable or unjustifiable for a board of
directors to refuse to prosecute, on the application of a stock-
holder, when there had been an adjudication on the point which
he seeks to have passed upon, which is conclusive upon the com-
pany.    And if the stockholder in the face of a refusal by the
directors on that ground should persist and commence the action,
an answer by the directors in his suit, that they had refused to
bring the action solely on the ground that the question had been
before adjudicated, would necessarily be followed by a dismissal
of his bill.    This argument goes to the root of this question,
and demonstrates that the decision of questions litigated in this
court in the suit brought by Ellerman, a stockholder, in his own
behalf and that of other stockholders, in which the company
was made a defendant and appeared, is conclusive in another suit
brought by another stockholder for the purpose of relitigating
the questions which have been determined.    If not so there can
be no end of litigation, for the court is then open to suit by
every stockholder, *seriatim*, presenting the questions over and
over for consideration and decision.

In *Daünmeyer* v. *Coleman, 11 Fed. Rep. 97*, Sawyer, C. J.,
says: "By reference to *Burke* v. *Flood*, *supra*, it will be seen
that a similar suit for these same grievances was brought by a
single stockholder, Burke, on behalf of himself and all other
stockholders—and it is a notorious, historical fact, of which the

Willoughby *v.* Chicago Junction Railways &c. Co.

daily newspapers have been full, that these are not the only suits brought in the same way for the same grievances. Is each holder of one of these five hundred and forty thousand shares of stock entitled to bring a suit in equity on behalf of himself and all other stockholders for an account of their transactions? Or, where such a suit has been brought by one stockholder, must the others come in and seek their relief in that suit? If each stockholder is entitled to bring such a suit, then there is something wrong in the law, and the sooner the supreme court by rule, or congress by statute, regulates the matter the better it will be for the due administration of justice."

It is urged that no party should be concluded without an opportunity to be heard; but this complaint does not lie in the mouth of Mr. Willoughby. He had an opportunity to be heard in the Ellerman suit. It was expressly for the benefit of all stockholders who might come in and contribute to its expense. He could, at any time before decree, have been made a party to the Ellerman suit, and have then advised the court of anything not before brought to its attention.

He had ample time to so apply after he actually knew of the pendency of the suit, and his solicitor was thoroughly informed of all proceedings in the Ellerman case in time to have intervened. Counsel admitted, upon the argument, that the question whether they should intervene in the Ellerman suit, or resort to an independent action, was considered and discussed before bringing the present suit was determined upon.

Besides, from the very form and nature of these suits, each stockholder must be considered as represented, for if he is in sympathy with the complainant he may become a party complainant by application to the court; if he is in sympathy with the threatened action of the company, he is represented by and in the corporation which is a necessary party to the suit. *March v. Eastern R. R. Co., 40 N. H. 548.* Not only this, but the court may, if satisfied that the interests of the corporation are not being properly presented or protected, admit a stockholder to be made a party defendant. *Bronson et al.* v. *La Crosse & M. R. R. Co., 2 Wall. 283.*

While one counsel on the argument seemed to regard it as the duty of the court to examine all questions *de novo*, counsel, who drew the original bill, appreciated the difficulty of the former adjudication, and sought to avoid it by alleging that the Ellerman suit was collusive.    The original bill alleges that the parties to the agreement, having grave doubts as to its legality and as to the legal rights of the New Jersey Company to enter into it, devised and put into operation a collusive suit in this court with a view of obtaining an adjudication in favor of the legality and validity of the agreement, in the guise of an action brought by one of the stockholders for the simulated and pretended purpose of having the said agreement declared an unlawful one.    That for such purpose Mr. Ellerman, at the request of the New Jersey Company, instituted the action ; that such suit was arranged between the parties before the agreement was executed, and that the suit was instituted accordingly ; that the Ellerman bill contains few, if any, of the material allegations in the Willoughby bill affecting the validity and legality of the said agreement ; that it made untruthful averments with reference to the value of the Tolleston property and the Central Stockyards ; that it was ingeniously drawn so as to attempt to secure from the court an adjudication favorable to the validity of the agreement upon an unfair and garbled statement of the facts and issues.

It next attacks the proceedings as indicative of fraudulent collusion, specifying that the bill by not waiving answer under oath required it; that the defendants voluntarily entered their appearance in the suit, without subpœna having been issued, and by their answers misstated the value of the Central Stockyards and the Tolleston property ; that no replication was filed, thereby admitting the facts stated in the answer ; that no evidence was taken ; and that shortly after the cause was heard.    These charges embrace collusion, deception, concealment, misrepresentation, craftily drawn pleadings, and imposition on the court.

While counsel, in opening the argument, repeatedly disavowed any reflection upon the counsel engaged in the Ellerman case, it is apparent that they could not have been innocent agents in such a scheme.    The ground on which a judgment is disregarded as

collusive is fraud; either a fraud in fact or a fraud on the court; and, so far as counsel are parties thereto, involves a charge of professional dishonesty. A court should be loth to believe that counsel, eminent in the law, who have risen to the front rank of their profession, who are distinguished in the state and the nation for their learning, ability and integrity, who hitherto have justly enjoyed the confidence of the bench, have combined to deceive the court to obtain a decision upon a simulated, imperfect or false presentation of a case. No such conclusion should be reached unless it is most clearly demonstrated by the facts or compelled as an irresistible inference therefrom.

. These charges of collusion made in the bill and on the argument may be thus grouped—it is alleged that it is to be inferred that the suit was brought by collusion:

1. Because it was so brought by agreement of the parties to the contract.

2. Because the bill does not waive answer under oath, and the defendants appeared without process and answered.

3. Because the bill is ingeniously drawn so as to attempt to secure from the court an adjudication on a false statement of facts and issues, in support of which it alleges concealment, in that the bill contains few, if any, of the material allegations in the Willoughby bill, affecting the validity and legality of the agreement; and misrepresentation, in that it states the value of the Central Stockyards at $250,000 and the value of the Tolleston property at $1,000,000.

4. Failure by counsel to present material points.

*First.* As to the first charge, there is not a particle of evidence to prove that any agreement or arrangement was made by Mr. Ellerman, with the parties to the contract, or with any other person or corporation, to commence his suit, or to show that he was solicited or in any way influenced to bring the suit by any one connected with the New Jersey Company or the Associate Packers. The answers of the New Jersey Company and the Associate Packers and the affidavits of Messrs. Winston, Armour and Swift, entirely clear them from the imputation.

*Second.* As to the bill waiving answer under oath and appearance without process, it is to be said that the fact that parties are willing so to appear and not resort to dilatory tactics, is certainly not evidence that the suit is fraudulently collusive.    That a bill does not expressly waive an answer under oath does not make it obnoxious to the charge of fraud is too clear for argument.    Such was the ancient practice of this court.    If the answer had not been truthful, it could have been met by replication and by proofs.

*Third.* In order to properly consider the charge that the Ellerman bill contains an unfair and garbled statement of facts, it is proper to ascertain upon what basis the suit was brought.

We are dealing now with the question of the integrity of counsel, and, to ascertain whether they have been guided by improper motives in framing the bill, it is but right that we should ascertain the object of the bill and the nature of the case which counsel proposed to submit to the court for decision.    The Ellerman bill states the ground of relief as follows (¶ *9*):

"But charges that the said agreement is not within the powers and franchises of the Chicago Junction Railways and Union Stockyards Company to make, and that such agreement is *ultra vires* the corporation, and that the carrying out of the same would be a perversion of the franchises and privileges of the said corporation, and the creation of debts and liabilities on the part of said corporation, and the payment of moneys contrary to the rights of the stockholders and to law and equity."

To sustain this charge of collusion on the ground of concealment, we should be convinced that the facts alleged to have been omitted were known to counsel or the parties, and that they were of opinion that such facts were material to the issue they proposed to submit.

On page 58 of the argument of complainants' counsel, furnished to the court at the close of the oral argument, and which it appears from the statement at its commencement is the brief submitted to the circuit court of Cook county, Illinois, in eleven cases there pending, wherein the Non-Associate Packers are complainants, is found a specification of these omissions as follows:

"The bill does not state that there are other packers besides the Associate Packers doing business at the stockyards. It does not state that the agreement discriminates or tends to discriminate, or that it is so claimed by the Non-Associate Packers. It does not state that there is a statute of Illinois prohibiting discrimination. It does not state that the Chicago Company is *quasi*-public in its nature. It does not state that the property of the Chicago Company has become impressed with a public use. It does not state that the Chicago Company has the right to condemn lands. It makes no allegations to the effect that the Chicago Company has railroad powers. It does not state that the Chicago Company owns railroad tracks, and operates or permits other railroad companies to operate the same, or that it is in receipt of four hundred thousand dollars, or any other sum per annum, from railroad tolls."

This is the only specification of the allegations omitted in the Ellerman bill which is given in the pleadings or by the counsel in this case. These allegations are each and all referable to the point, that this agreement creates an illegal discrimination between the Associate and Non-Associate Packers. It does not appear that Mr. Ellerman, a resident of England, or his counsel, a resident of Jersey City, knew of these various matters specified. The Willoughby bill was confessedly prepared under the advice of the Chicago counsel, who are, of course, presumed to be thoroughly conversant with the facts mentioned. They are also the counsel of the Non-Associate Packers, in whose interest, if not in whose behalf, these different matters would seem to be urged. Without reference to the want of merit in the objection hereinafter shown, one would not be justified in saying that a stockholder of the New Jersey Company who was opposing the proposed contract, not as a business arrangement, but as one beyond the powers of the corporation, who was prosecuting his suit solely for the protection of the company, and who had no connection, business or otherwise, with the Associate or Non-Associate Packers, or his counsel, are guilty of attempting to mislead the court in an inquiry whether the proposed contract is invalid as unauthorized by its charter, because they omit to make the charge of illegal discrimination against the Non-Associate Packers made by Mr. Willoughby's counsel in his bill, when no two of the counsel in this case, after thorough examination, agree as to wherein this alleged discrimination exists.

As to misrepresentation.    In this connection the insistment is that there was misrepresentation for the purposes of concealing the true facts from the court as to the value of the Tolleston and Central Stockyards properties.

It is charged that the Tolleston property was of comparatively small value, of no special adaptability to the purposes of stockyards, and witnesses are produced who give their opinion that such is the correct estimate, noticeably the affidavits of the Non-Associate Packers.    These gentlemen, it appears, are interested in the formation of the National Stockyards Company, a rival corporation to the Chicago Company, and in the Stickney tract, a tract of land purchased by them near Chicago for stockyard purposes, and with whom after much pressure the Associate Packers refused to continue in negotiations for its purchase. Armour, Swift and Morris all state the process by which the purchase and the proposed development of the Tolleston tract was evolved, and their expenditures and arrangements, and give it as their opinion that the property is admirably adapted to the purposes for which they bought, and to which they proposed to apply it.    We have the usual conflict of testimony by experts with the assertion by some of one value and by others of another.

The main charge in the bill, as to the Central Stockyards, is that they did not cost and were not worth more than $30,000, and that the buildings placed thereon were not worth more than from $3,000 to $5,000.    The clear proof is that they actually originally cost $75,000, and that the improvements costs $30,000, and it is sworn to by Mr. Armour and by others that the earning capacity of the yards is from $225,000 to $250,000 a year.

As to the Tolleston tract, its value is not to be computed or estimated as a simple tract of land consisting of sand dunes, sloughs and marshes, but with reference to its adaptability to the purposes had in view by these parties, and in that point of view these parties all declare that the same is worth the value which was placed upon it, and it is proved that the market value advanced some five hundred per cent. on the rumor that the stockyards were to go there.

But the charge now considered, is, that these valuations were made for the purpose of deceiving the court as to the value of these separate properties.    It is said that they were made in an entirely safe and convenient way, namely, "That the value *did not exceed*—for the Central Stockyards, $250,000, and for the Tolleston tract, $1,000,000." Without stopping to consider whether any judge would be misled by a statement thus made when the exact value of property was in question, it is but fair to the pleader who is attacked by this charge to inquire just what the allegation was and in what connection it was made.    The statements are as follows :

"The value of the premises known as the Central Stockyards does not, as your orator is informed and believes, and so charges, now exceed the sum of two hundred and fifty thousand dollars.  *  *  *  That the value of the one thousand acres of land at Tolleston, in the State of Indiana, together with the easements, &c., does not now exceed the sum of one million dollars, if it equals that," and "that said one thousand acres of land, together with the easements, connections, rights and privileges aforesaid, is all the property the Tolleston Stockyards Company will own, upon the carrying out of the said agreement, and your orator charges that it is not expected that the said Tolleston Stockyards Company will be able to pay the interest maturing upon the bonds to be issued by it according to the agreement, and that the interest on said bonds will have to be paid by the Chicago Junction Railways and Union Stockyards Company, together with the principal, unless by some unexpected possibility the value of the property at Tolleston should become greatly increased."

This statement is to be taken in connection with the agreement of July 27th, 1891, which was the subject of attack ; under that the New Jersey Company was to take an assignment of the stock of the Tolleston Company, which company was at that time to be the owner of the one thousand acres of land, subject to a mortgage to secure the payment of $2,000,000 of bonds, which bonds were to be guaranteed by the New Jersey Company.   In presenting the question as to the assumption of this liability, the Ellerman bill sets forth the only tangible property acquired from the Associate Packers under the agreement, and which, of course, is to be considered as the only substantial backing of the guarantee, and states that the value of the Central Stockyards does not exceed $250,000, possibly mortgaged to its full value, and

the value of the Tolleston property does not exceed $1,000,000, as a demonstration that so far as the value of the tangible property was concerned, its value was entirely inadequate to the amount of the guarantee.

I fail to see in this method of statement, or in the statement itself, any evidence of intention to mislead the court, and that such was not the result is evident from the opinion filed in the Ellerman suit, for it was there distinctly held that the consideration of the agreement was not to be arrived at by a disintegration and appraisement of its separate parts; that it was essentially an entirety, and was agreed to as a whole. It says (at *p. 236*):

"All of these considerations moving to the company are what the law denominates valuable; the lands and the easements were valuable; the compromise of the suits was valuable; the agreement to secure the two million dollars in business was valuable; the agreement not to commence a rival business within a restricted territory and for a given term was also valuable. All these considerations moving from the parties of the second part, were in law a unity, and for such unity they were to be paid the amount agreed on. The law will not, because it cannot, apportion that amount to and among the realty, compromise and covenants. It cannot apply the consideration distributively to the several obligations of the parties of the second part. The consideration to the company for its promises was the obligations generally of the parties of the second part."

*Fourth* The last indication of collusion alleged is the failure of counsel to present and urge what are claimed as important, if not controlling questions of law. These relate to the charge of discrimination, which has been alluded to, and will be afterwards more fully considered, and the insistment that it is not competent, under the laws of this state, to organize a corporation, one of the objects of which is to hold the stock of another corporation.

The junior counsel of the complainants disclaimed any intention of attacking the original incorporation of the New Jersey Company, and sought by a refinement of argument to limit the application of his contention to the controlling of the company whose stock was purchased and held. But the senior counsel frankly admitted that the logical conclusion of the argument was, that the original incorporation of the New Jersey Company was invalid and contrary to law; while the brief referred to throws

off all disguise and makes the attack direct. However interest-
ing an examination of the point might be, this is not a cause in
which it can be indulged; as a rule such a question can only be
presented to the court by the attorney-general on behalf of the
state, and such was the *Chicago Gas Case, 130 Ill. 268;* the
*New York Sugar Trust Case, 54 Hun 354; S. C., 121 N. Y. 582;*
and the *Ohio Standard Oil Case, 30 N. E. Rep. 279,* upon
which so much stress was laid. The Ellerman suit, however,
was a case in which a stockholder was permitted to sue in the
place of the company and in its behalf, to protect it from threat-
ened injury from a contract entered into by its directors; and we
have the good faith of such suit gravely assailed because counsel
therein failed to argue for its abrogation, on a ground which
would have established, if sound, that the incorporation of the
company itself was illegal. The simple statement of this posi-
tion is a sufficient justification, if any were needed, to the learned
counsel for complainant in the Ellerman case for not having
brought it to the attention of the court, and urged its adoption,
and effectually disposes of the suggestion that such omission is evi-
dence of collusion in the bringing and prosecution of the suit.

Not a shadow of doubt is thrown on Ellerman's ownership of
the preferred and common stock of the New Jersey Company,
as alleged in his bill of complaint.

In so far as the same questions were presented in the Eller-
man and in this case, while it is true that in the argument of
that there was not so much time occupied, nor the same exhaust-
ive reading of authorities, not the elaboration of propositions
and reasons, as there was in this, with all due respect, the points
were argued with as much earnestness, apparent sincerity, ability,
clearness and force as has been displayed in the presentation of
them by counsel of the complainants in this case.

Neither the evidence offered nor the record sustain the charge
of collusion made to impeach the decree in the Ellerman case.
Nothing has been presented to satisfy a fair mind that there was
not in that suit a " real interest, a real argument, a real prosecu-
tion, a real defence " as the foundation of a " real decision "—
Solicitor-General Wedderburn's comprehensive summary of the

requisites of a conclusive decree in the *Duchess of Kingston's Case,* referred to in *Earl of Bandon* v. *Becher, 3 Cl. & F. 479, 512.*

The Ellerman suit, not being collusive, must be held to be conclusive in this, upon all questions which were therein decided, and I have here to say, that after giving patient attention to the oral and printed arguments of counsel, and after full and careful consideration thereof, I find no conclusion in the opinion rendered in that case which principle or authority would require me to change.

Before entering upon the consideration of the matters, which arise under the contract of January 15th, 1892, not passed on in the former suit, and which are the subject-matter of the supplemental bill, it will be well to ascertain the provisions of the contract of January 15th, 1892, as compared with the provisions of the contract of July 27th, 1891.

Under the contract of 1892, the Associate Packers covenant—

*First.* To cause to be conveyed to the Chicago Company, the property known as the Central Stockyards for $1. By the other agreement this property was to be conveyed to the Chicago Company for the consideration of $250,000, to be paid either in cash or secured by a mortgage on the property, payable in ten years, with interest at five per cent.

*Second.* To abandon and compromise the claims and demands involved in the suits brought by them in the Illinois court against the Chicago Company. This is substantially the same in the other agreement.

*Third.* To convey to the New Jersey Company one thousand acres of land at Tolleston, free and clear of all encumbrances, except certain railroad rights of way, and also granting rights of way and easements over the adjoining twenty-seven hundred acres of land, in order to connect with railroads, canals and the lake. By the other agreement, the capital stock of the Tolleston Company, fully paid and non-assessable, was to be assigned to the New Jersey Company, with the covenant that at that time the Tolleston Company should then own the one thousand acres and the easements, free from encumbrances, except a mortgage

securing the issue of $2,000,000 five per cent. bonds, of which the New Jersey Company was to guarantee the payment.

*Fourth.* To continue their business at Packington, for fifteen years, unless the Chicago Company's yards were sooner moved, and that all cattle and live stock slaughtered by them on their premises, or within two hundred miles of Chicago, should for that time pass through and use said yards, and pay the usual yardage and charges. This is substantially the same as in the other agreement.

*Fifth.* Guaranteeing that the Chicago Company shall receive, from yardings and charges, on cattle and live stock, owned, or purchased by, or consigned to the Associate Packers, at said yards, $2,000,000 within six years, and promising to pay any deficiency. This is substantially the same in the other agreement.

*Sixth.* For fifteen years that they will not use, or permit others to use, the lands retained by them, at Tolleston, for slaughtering, canning or packing-house purposes, unless the New Jersey Company should expressly waive the condition in writing, which is substantially the same in the other agreement.

*Seventh.* For fifteen years they will aid, assist and co-operate with the Chicago Company, and the New Jersey Company, in all lawful ways, in furthering and promoting the business and interests of the Chicago Company, which was not in the other agreement. Further, that during fifteen years, they will not, in Chicago, or at any place within two hundred miles thereof, establish or carry on any stockyards for their own live stock. By the other agreement it was provided that they would not establish stockyards for the general use of the public.

*Eighth.* So long as the Chicago Company conducts the business of a general stockyards on its premises in Chicago, they will not establish stockyards there for their own stock. Substantially the same in the other contract.

*Ninth.* A covenant to execute any further instrument which might be deemed necessary to carry out the contract &c. Substantially the same in the other contract.

*Tenth.* The New Jersey Company covenants to issue to the Associate Packers $3,000,000 of income bonds, dated July 1st, 1891, payable in 1907, interest payable semi-annually in January and July, not exceeding five per cent., and payable out of income of current year annually, after paying present fixed charges on its issue of ten million collateral trust bonds, its current expenses, and six per cent. cumulative dividends on its preferred stock, but before its common stock shall be entitled to any dividend. The interest on the income bonds not to be cumulative. The bonds to contain a provision that $100,000 was to be set aside after paying its fixed charges, current expenses and preferred stock dividends semi-annually, to be applied, first, to the payment of the interest on the current half year on the income bonds then outstanding, and, second, to redeem or purchase the income bonds.

*Eleventh.* The New Jersey Company to have the option to deliver common stock at par in lieu of any or all of the income bonds, with a provision for exchange of income bonds delivered before the 1st of May, 1892, which, in consequence of the expiration of the time, has become nugatory. These arrangements for the payment of the consideration are essential changes from the other contract.

The agreement contains provisions with reference to the Associate Packers not parting with bonds and stock, and for the deposit of said bonds with the Central Trust Company, and concludes with the fourteenth provision, as follows : "Any and all previous agreements heretofore executed, and now existing between the parties hereto, are hereby cancelled and annulled."

The supplemental bill alleges that the agreement of January 15th, 1892, is *ultra vires* the New Jersey Company, and is contrary to the laws and public policy of the State of New Jersey, in this, that the New Jersey Company has no right or power under its charter, in consideration of the covenants entered into by the Associate Packers, to issue and deliver to the Associate Packers $3,000,000 of income bonds, as provided by the tenth paragraph of that agreement, or to deliver to the Associate Packers its common stock in lieu of said income bonds, or any

part thereof, for the purchase of three thousand acres of land at Tolleston, or for the purchase of the Central Stockyards, or for any other of the purposes or considerations, or pretended considerations, mentioned in the said agreement. Neither has the New Jersey Company the right or power to make a contract for the conveyance to the Chicago Company of the Central Stockyards, nor has the New Jersey Company any right or power to enter into any agreement to issue its bonds to purchase property not necessary for its business; that it would be a diversion of its assets, and a manifest wrong upon the stockholders, for it to issue its bonds to the extent of $3,000,000, or any other sum, to the Associate Packers, or to deliver to them its common stock in lieu of such bonds, or any part thereof; that the New Jersey Company has no right or power to issue obligations or its stock, or to pay out its funds for any purpose mentioned in the agreement, or to suppress competition with the Chicago Company, or to subsidize customers of said Chicago Company for a period of fifteen years, or for any other period, and reiterates certain allegations contained in the original bill charging illegality in the former agreement.

It is urged that the agreement of January 15th, 1892, should not, and that that of July 27th, 1891, if unrescinded, ought not to be carried into effect, because each creates an unjust and illegal discrimination against the Non-Associate Packers, in favor of the Associate Packers. If there is any excuse for this suit it lies in the fact that the Ellerman suit failed to raise this question.

The advantage, if not necessity, of this contract to the future successful operation of the Chicago Company, is, if possible, made more apparent in this case than it was in the Ellerman suit.

It is admitted on all hands that the business of the slaughtering, packing and canning establishments is vital to the Chicago Company in its present location.

The bill alleges that the existence, development and success of the business of the stockyards and the establishments of the packers, is interwoven with, and dependent upon, each other. The answer says (¶ *28*):

Willoughby v. Chicago Junction Railways &c. Co.

"That the business of the Chicago Company is to a great extent dependent upon the permanent market and demand created by the presence of slaughtering, packing and canning establishments situated in the immediate vicinity of its premises, and kept in operation during the whole year, and that it would be and has long been recognized by the business community as difficult, if not impracticable, to establish and maintain large stockyards, without at the same time having in the direct vicinity of such yards slaughtering, packing and canning establishments in continuous operation, and slaughtering, not only hogs, but a large number of cattle, to create a demand and market for any cattle and live stock that might seek accommodation at such yards."

Various affidavits of persons familiar with the stockyards business are presented, showing that its successful prosecution is largely dependent on the operation of such establishments in its neighborhood. Of the profit of $1,700,000 alleged to have been made in 1891 by the Chicago Company from its business, the bill claims that nearly thirty per cent. was derived from the business done by it with, and for, and by reason of, the establishments of the Non-Associate Packers, while it was claimed and conceded in the Ellerman suit that from fifty-five to sixty per cent. of these profits resulted from the business carried on by the Associate Packers, leaving only the narrow margin of from ten to fifteen per cent. of profits obtained from the business of persons in no way connected with these firms or establishments.

It now appears that the parties engaged in the slaughtering, packing and canning businesses at Packington, including Associate and Non-Associate Packers, had for some two years prior to the date of the first agreement, contemplated a removal of their businesses from the vicinity of the Chicago Company's stockyards.

In pursuance of the scheme, a company called the Chicago National Stockyards Company was organized by some of the Non-Associate Packers, and a tract of land called "The Stickney Tract," near Chicago, purchased to establish stockyards thereon.

They had negotiated for water and railroad facilities, and had endeavored to secure the Associate Packers to join in the enterprise, but in consequence of lack of drainage and water advantages, the latter refused to continue in the scheme, and com-

menced prospecting on their own account. This led to the selection by them of the property at Tolleston, which they secured at a cost of nearly $750,000. They proceeded immediately to have a careful and thorough topographical survey made of the whole tract, both to ascertain its availability for the purpose of stockyards and as a site for manufacturing; they also had made a survey for a ship canal, eighteen feet deep and two hundred feet wide, extending into the lake, and from the lake to the basin of the Grand Calumet river, which traverses the tract, where a commodious harbor was to be constructed. They also made a contract with the Elgin, Joliet and Eastern Railway Company, by which that company was to construct a railroad connecting the tract with all the roads entering Chicago.

They also purchased and fitted up the Central Stockyards for their use, until they could have the Tolleston property ready for occupancy. They also commenced actions in the courts of Illinois to compel the Chicago Company to permit the use of its tracks, for the transportation of live stock consigned to the Central Stockyards, without being subject to the yardage and other fees at the Union Stockyards.

Although all these preparations are charged in the bill to have been feigned on the part of the Associate Packers, counsel, in the argument, was forced to admit that the court must find, from the evidence, that they intended in good faith to remove their works to Tolleston. The directors of the New Jersey Company were thus confronted, on the one hand, with a threat on the part of the Non-Associate Packers, to remove to the Stickney tract, restrained from doing so only by the absence of drainage and water advantages, and, on the other, by the active preparations of the Associate Packers to remove to Tolleston, where every facility for carrying on their business either existed naturally or was artificially possible by construction. The Associate Packers were men of ample means, of great experience, of business energy, possessed of everything necessary to develop the possibilities of their purchase. This of itself threatened ruin to the Chicago Company, and, if followed by the Non-Associate Packers, would entirely destroy its business. It was this critical

condition which induced the making of the agreement, which is now attacked by a stockholder as creating an unlawful discrimination as against the Non-Associate Packers.

In order to properly consider this question some examination of the business at the stockyards is necessary.

The stockyards of the Chicago Company embrace about three hundred and twenty acres. In the immediate vicinity there have been erected slaughtering, packing and canning establishments. If there are any other than those of the Associate and Non-Associate Packers, the fact does not appear. The railway tracks of the company form a complete belt line encircling not only its stockyard, but also, with the exception of that of Underwood & Company, all the property and plants of the slaughtering and packing establishments, located in the neighborhood of, or contiguous to, the said stockyards. This belt line connects with every railway entering the city of Chicago, and with all, except possibly one, the said slaughtering and packing establishments. The railways of the company embrace a very large number of parallel tracks, with switches and sidings, connected with and interlacing one another, and said to form an intricate, complicated and extensive system of railway tracks and railway connections. Live stock to be slaughtered at the slaughtering houses in the immediate vicinity of the yard, are delivered there by the railroads and unloaded into pens, and, after having been fed and watered, are driven through runways or viaducts connecting the yard with the various establishments. Those in transit, or reshipped on the hoof, are, of course, after being fed, again loaded on the car. A charge is made for loading and unloading, and also for yardage and feed. These last items of yardage and feed, it appears to be conceded, form the largest sources of income to the company, yielding some eighty per cent. of its receipts. These charges are paid by the consignees of the cattle. The Chicago Company is also the owner of the Chicago and Indiana State Line Railway Company, a road some two miles long, connecting with the main track of the Chicago Company, and built, as stated in the answer, for the accommodation of manufacturing establishments.

During the year 1891 there were received at the stockyards fourteen million two hundred and ten thousand and eighty-four head of live stock, exclusive of horses; four million seven hundred and sixty-five thousand three hundred and fourteen head were reshipped to other points, and nine million four hundred and forty-four thousand seven hundred and seventy, or over twenty-five thousand a day, were slaughtered, or otherwise disposed of, within twenty-four hours, at the Chicago market.

The number of live stock consigned to the slaughterers and packers, Associate and Non-Associate, is a very small proportion of the number received—the consignees as a rule being the live stock brokers who receive the stock from and dispose of it for the original shippers or sellers. Mr. Botsford, one of the most prominent of the Non-Associate Packers, and who claims to be thoroughly conversant with the whole business, in one of his affidavits, explaining the fact that in 1891 the Associate Packers paid $74,000 for yardage charges and $36,000 for feed charges, and the Non-Associate Packers but $4,000 each for similar services, says, that some or all of said Associate Packers are feeders or growers of live stock at points outside of said yard, and also receivers of live stock at said yards; that such business is entirely distinct and independent from the business of packing, slaughtering and canning, and that there are many others engaged at said yards in the business of receiving live stock, as well as many others engaged at points outside said yards, in the caring and feeding of live stock for shipment to said yards; that the receiving business is chiefly in the hands of live stock brokers who make it a specialty, and such brokers advance to the Chicago Company the yardage and feed charges on substantially all live stock which comes to said yards, and the payments thus made are deducted from the proceeds realized on the sale of said live stock, and that the amount so paid by the Associate Packers is quite infinitesimal compared to the amounts paid by the regular shippers of live stock to said yards.

There can be no question but that the importance to the business of the Chicago Company, of the packers' establishments in the vicinity of the yards, is due to the fact that they are the pur-

chasers of nearly all the cattle disposed of in Chicago, and which seek that point in such numbers, because the packers being there as purchasers insures a certain and ready market.

The Chicago Company does not own any rolling stock, except such as is used entirely for the construction and repair of its tracks. All freight cars hauled over its tracks, are drawn and handled exclusively by the railroad companies, under a traffic arrangement, by which the Chicago Company allows to be hauled over its tracks, cars loaded with live stock, to be delivered and unloaded at its stockyards; on all such live stock it collects and receives customary charges for feeding and yardage, and makes no trackage charges whatsoever therefor to the railroad companies delivering the same; by like arrangement, cars loaded with live stock, in transit and consigned to points beyond Chicago, are transferred by the railroad companies, over its tracks, from one connecting road to another, the Chicago Company charging and collecting from the several railroad companies a trackage charge per car for the use of its tracks; by like arrangement, cars loaded with the products of the slaughtering, packing and canning establishments, and other dead freight, consigned to and from the same, are hauled by the railroad companies over its tracks, the Chicago Company charging the several railroad companies, for the use of its tracks by cars containing dead freight, a fixed charge per car. To summarize: the Chicago Company, by a traffic arrangement with the railroad companies, permits said companies to haul cars over its tracks, the trackage charge being regulated and imposed as follows:

· *First.* No charge on cars loaded with live stock, which are to pay, and do pay, yardage and feed charges.

*Second.* A trackage charge on cars loaded with live stock in transit.

*Third.* A trackage charge per car for dead freight.

There is also a charge for switching paid by the railroad companies, which is alleged to be only enough to bear the expenses of having the work done.

The bill contains a general charge to the effect that it was the intention of the Chicago Company, the New Jersey Company,

and the Associate Packers, in entering into said agreement, and the effect thereof was, and is, to stifle competition with the Chicago Company; to create for the Associate Packers over said other packers a preferential arrangement and unlawful discrimination, rebate or drawback, in the matter of the payment by the Associate Packers of railroad toll, trackage, freight, yardage and other charges to the Chicago Company, for a period of at least fifteen years, from and after the date of said agreement.

This charge of the allowance of an unlawful rebate of railroad toll, trackage and freight is aimed at the Chicago Company as the owner of its railway tracks. Pleading the Illinois statute entitled "An act to prevent extortion and unjust discrimination in the rate charged for the transportation of passengers and freight on railroads in this state" &c., can have no other pertinency.

That act, condensing the sections pleaded, may be epitomized as follows:

Section 1 relates to extortion, by any railroad corporation in the state charging more than a reasonable rate of toll or compensation for transportation of passengers or freight.

Section 2 provides that any unjust discrimination, by any such company, in the rate or charge of toll or compensation for the transportation of passengers, or freight of any description, or for the use and transportation of any railroad car upon its road, is made unlawful.

Section 3 provides that the following shall be considered as *prima facie* evidence of unjust discrimination, (*first*) to charge the same, or a greater amount of toll, for a like quantity of freight of the same class for a short haul than is charged for a long haul; (*second*) a difference in rates of depot charges at different places; (*third*) charging different amounts of toll for like quantities of freight of the same class to different persons, for equal distances, in the same direction; (*fourth*) collecting different amounts for depot charges, for similar services, from different persons; (*fifth*) making different rates of freight charges to different persons, from the same place, for similar services; (*sixth*) making different charges to different persons, for long and short haul for the transportation of railroad cars in the same direction;

(*seventh*) making different rates of charge for transportation of cars to different persons, for equal distances.

By section 2, any corporation, owning or operating any railroad, is declared a railroad corporation under the act, which would bring the Chicago Company under the provisions of the act as the owners of the railway without reference to the principle on which *Penn. Co.* v. *Ellett, 132 Ill. 654,* was decided.

The bill charges, and the answer denies, that one-third of the entire net annual profits of the Chicago Company and of its stockholder, the New Jersey Company, is derived from trackage and other railroad charges and railroad tolls fixed by, and paid to, the Chicago Company in the conduct of its business, but it cannot be denied that a very large sum is annually paid to it by the railroad companies under their traffic arrangement, and also by the packers, through said companies, on account of freight. But how does this really affect the packers, Associate or Non-Associate? So far as trackage is concerned, it is to be remembered that no trackage is charged on the animals brought to the yards, fed there, and slaughtered in Chicago—it is collected only on live stock *in transitu* and on cars containing dead freight, and it is only with reference to the last that the Non-Associate Packers can be in any way materially affected. As to freights collected by the Chicago Company on live stock, Henry Botsford says that it is paid to, and collected by, that company simply as a collecting agent for the railroads transporting said live stock, and constitutes and forms no part of the revenue of the Chicago Company.

The defendants aver in their answer that any and all income which the said Chicago Company derives, or has ever derived, from the use of its tracks by railroad corporations and common carriers, has been paid to it by the railroad companies exclusively, and not in any way by any of the Associate or Non-Associate Packers referred to in the complaint; that such trackage charge is entirely borne and defrayed by the railroad companies; that the railroad companies do not add the trackage charge, they pay to the Chicago Company for the use of its tracks, to the charge made to the said packers, directly or indirectly; that all shipments to said packers are under through bills of lading, issued

by the railroad companies, and not by, or on behalf of, the Chicago Company, designating the several packers' concerns as the place of delivery, and specifying the said place as being at the said stockyards; that all product slaughtered for, and packed by, any of the packers, Associate or Non-Associate, are shipped very largely to points beyond the city of Chicago; that said shipments are evidenced uniformly by bills of lading, issued by the railroad companies, and not by, or on behalf of, the Chicago Company, specifying the place of shipment, as being by the several concerns at said stockyards to the place of destination. This is attempted to be met by the affidavit of Mr. Botsford, in which he says:

"The said railroad companies, in delivering dead freight to the packers, now charge and always have charged switching charges, said switching charges being partly for the use by said railroad companies of the railway tracks of the Chicago Company,"

and he appends two expense bills, rendered to the consignee, Mr. Hately, by the Chicago and Northwestern Railway Company. By them it appears there was collected $2 for "miscellaneous charges," which is placed in a column under that head. There is nothing, however, to indicate that the miscellaneous charges are the trackage or switching charge of the Chicago Company. Mr. Botsford's affidavit would indicate that the switching charge is included in this amount.

The affidavit of Mr. George T. Williams, February 20th, 1892, says with reference to the charges made by the Chicago Company for allowing dead freight to pass over its tracks:

"'The service is not rendered, directly or indirectly, in any way by the Chicago Company. The cars hauled and the power hauling are entirely owned by, and under the control of, railroad companies using the Chicago Company's tracks. No packer, large or small, ever pays to the Chicago Company any freight whatever, all such freight being collected by or for the various railway companies centering in Chicago. As a matter of fact, the rate made by the railroad companies to and from Chicago is the same to shippers and consignees whether or not the location of the shipper or consignee requires the use of the Chicago Company's tracks. That is to say, the rate made by the railroad companies to and from Packington, or any of the premises of the

Willoughby *v.* Chicago Junction Railways &c. Co.

packers situated in proximity to the Chicago Company's yards, is the same as it would be if the tracks of the Chicago Company were not used, and the premises were situated somewhere else in the city of Chicago."

The answer alleges that none of the matters, referred to in the bill of complaint, relate to, or in any way involve, directly or indirectly, the Chicago and State Line Railway Company, or the use of its tracks. Some question was raised as to the correctness of this averment, but the last affidavit of Mr. George T. Williams would seem to establish its accuracy.

The weight of the evidence clearly is that the trackage charges paid by the railroad companies to the Chicago Company, with the possible exception of the switching charges, said to be only sufficient to defray the expense, is not repaid by the packers to the railroad companies.

The contention of complainants' counsel is, that the agreement provides for a discrimination by the Chicago Company against the Non-Associate Packers, which is unlawful, first, because it is in violation of the Illinois statute. But the Chicago Company is not a party to the agreement. It is said the New Jersey Company by its ownership of stock practically controls the Chicago Company, and that thus its engagements will be performed by it; but what is the Chicago Company to do under the agreement? Absolutely nothing but accept a conveyance of the Central Stockyards property for a nominal consideration, and it cannot be pretended that this violates any law. How then can the New Jersey Company be said to violate the Illinois statute in making a discrimination? It is the contracting party, but it owes no public duty; as was said in the opinion filed in the Ellerman case (at *p. 243*):

"It should be borne in mind that the Junction Company is a trading corporation, not engaged in any public business, or owing any public duty, or exercising any franchise of eminent domain. Its operations under its charter might be entirely suspended without detriment to a single public interest, and it would seem that in making this agreement, all that was involved was the partnership relation between the shareholders of the company."

It can scarcely be claimed that the New Jersey Company could not, as a stockholder of the Chicago Company, make a

contract with customers of the latter, if it was within its chartered powers, although it involved the payment of moneys, either annually or in gross, to such customers, unless it violated some special enactment. While it might not be competent for the Chicago Company to make some contract, or do some act, beneficial to its interests, because not within its chartered powers, there could be no valid reason why an individual stockholder should not do it, nor why a corporate stockholder shall not do it, unless the contract or act was not authorized by its own charter of incorporation. This contract is eminently advantageous to the Chicago Company and to the New Jersey Company, its stockholder. Assuming it is within the scope of the chartered powers of the New Jersey Company it can only be illegal because it violates some express provision of law. There is nothing to prevent such an advantage being given by a stockholder to a customer of a corporation even if such corporation is subject to a public duty. An incidental benefit thus given to one customer cannot be held to be a giving of a rebate, or a discriminating charge. Nor can I see how the agreement of the New Jersey Company with the Associate Packers, customers of the Chicago Company, although providing for an annual payment to them, can be held to provide for a rebate or discrimination in violation of the Illinois statute.

But if it is admitted that the New Jersey Company stands for the Chicago Company—that the latter is a railroad corporation under the statute of Illinois, and as such is subject to its provisions, and owes a public duty, and that as the performance of the contract is to be made in Illinois, it is subject to the laws of that state, wherein does the agreement provide for an unlawful discrimination or rebate ? In *Messenger et al.* v. *Pennsylvania R. R. Co.*, 7 Vr. 407 (*36 N. J. L.*); *S. C. on appeal*, 8 Vr. 531 (*37 N. J. L.*), the agreement was one by which the defendant company was to allow the plaintiffs such a drawback as would bring their freight twenty cents per hundred and ten cents per hundred lower than the lowest. In *Union Locomotive & E. Co.* v. *Erie Railway Co.*, 8 Vr. 23 (*37 N. J. L.*), the agreement was that the cars of the plaintiffs should be the only cars employed in carrying locomo-

tive engines and tenders over the defendant's road—giving them practically a monopoly in the transportation of that kind of freight.   In *Stewart et al.* v. *Lehigh Valley R. R. Co., 9 Vr. 505 (38 N. J. L.)*, the covenant was not to allow to others a drawback from established rates on the transportation of merchandise over the Morris canal, which it was agreed to allow to the plaintiffs, and it was held that the monopoly clause was void, but that the agreement for a drawback was to be enforced.   In these cases the discrimination is clear.   Without specifying them in detail, every other case cited by the complainants' counsel, as well as those referred to in the exhaustive and instructive consideration of the question in defendants' brief, will be found to be cases of palpable discrimination, indicated by positive agreements for a reduced rate, drawbacks or rebate, exclusive privileges or some similar arrangement.   Whether discrimination can be made lawfully or not if not unjust, and the above questions considered in those cases, I do not stop to examine, because I do not detect in this case that the agreement of the New Jersey Company is open to such charge.

It is obvious that the agreement does not in terms make any provision looking to such a purpose.   The bills admit this—the original bill charges—

"that the Chicago Company and the New Jersey Company intend hereafter to make, and will make, such charges in the premises to all of the packers and others doing business at the said stockyards, as shall have the appearance of uniformity, but at the same time give to said Associate Packers the preferential advantage, discrimination, rebate and drawback covered and embraced in said illegal agreement, and are unwilling and wholly fail and refuse to make to others, than said Associate Packers, a similar allowance either in property or in its money equivalent."

The supplemental bill makes substantially the same charge. A very simple test will demonstrate that there is no discrimination provided for in the agreement.   As suggested by counsel for the defendant company, the remedy of a party injured by an agreement entered into by a corporation owing a public duty, making unjust discrimination in favor of one customer against others, would not be to enjoin the giving of the special rate or

rebate agreed on, but to secure a similar rate or rebate for similar services under like conditions. See *Stewart* v. *Lehigh Valley R. R. Co., supra.* But in what practical or legal way could any court give to the Non-Associate Packers the advantages contracted to be given to the Associate Packers?

But it is said, while the contract makes no provision in terms for unequal charges, and the Chicago Company does not intend to discriminate in that way, the whole scheme is a device to evade the statute, and that the statute provides not only that all such discriminating rates, charges, collections or receipts, when made directly, but also when made by means of any rebate, drawback or other shift or evasion, shall be deemed and taken against such railroad corporation as *prima facie* evidence of the unjust discrimination prohibited by the terms of the act. But what prohibition of the act is sought to be evaded by the agreement? So far as the Chicago Company, as a corporation owning a railroad, is concerned, it must be those provisions of the act aimed at different charges for depot charges, or for the transportation of cars over its tracks to different persons, or for long or short hauls. In view of the operations of the company as set out in its answer and the evidence, these are the only provisions of the act which apply.

There being no provision for direct preference, in what does the alleged discrimination consist, or how is it created? And it is remarkable, as before suggested, that no two of counsel agree as to just how discrimination or rebate is provided for. The specification of the bill is as follows:

"The said illegal agreement provides, in effect and intent, for a bonus, rebate or drawback to be given to the Associate Packers for doing business with the Chicago Company. By the terms of said illegal agreement, in consideration of the Associate Packers agreeing that their business shall net to the Chicago Company two million dollars during the next six years, or an average of $333,333.33 during the year, an unlawful rebate or drawback, amounting in effect to at least $250,000 is allowed and agreed to be paid annually to the Associate Packers for the next fifteen years."

How a rebate of $250,000 per annum is evolved from the guarantee by the Associate Packers that their business shall net an average of $333,333.33 a year is not easily understood.

Willoughby v. Chicago Junction Railways &c. Co.

Mr. Stevens develops discrimination from the fact that, as the agreement provides for the payment, on account of principal and interest, of $200,000 per annum, which is one-fourth of the profits derived from the business of the Associate Packers annually, it amounts to a rebate of twenty-five per cent. Mr. Mc-Carter would seem to think it was to be derived chiefly from the yardage charges and to lean to, if not adopt, the idea stated in the bill of complaint, basing it on the one-sixth of the $2,000,000 business guaranteed by the Associate Packers in six years; while the Chicago counsel argue in the brief handed up, first, that as all the Packers, Associate and Non-Associate, may hereafter become consignees of cattle and freight, and thus employ the railway tracks, the Associate Packers, by being paid on account of this contract from time to time, would have their outlay for freight refunded; and, second, that the trackage charges, being collected by the railroad companies from the packers, the payment by the New Jersey Company to the Associate Packers of any of the consideration agreed on is a repayment of such amount. We have seen that the evidence does not sustain the assumption upon which this last claim is founded, while the deduction would prevent any corporation charged with a public duty from any outside dealing with a customer unless it became subject to a charge of creating an unjust discrimination.

The position taken is, that the arrangement is a shift or evasion of the Illinois statute; in other words, that this intricate scheme has been concocted for the purpose of giving to the Associate Packers some preference in the matter of railroad charges in violation of the prohibitions of the act.

The meagreness of the payments by all the packers for railway service, if, indeed, they make any—the fact that the railroad companies pay the trackage and other like expenses would seem to dispose of the objection. But the question hinges on the good faith of the transaction, for if it was entered into *bona fide*, then the charge of evasion rests on nothing but the merest suspicion. If the Associate Packers and the New Jersey Company have gotten up this elaborate plan in order to give the Associate Packers a preference over the Non-Associate Packers in the matter

of trackage charges, if the charges of the bill are true that they have bought a worthless sand waste, and had false prices inserted in the deeds as a consideration—if they have made a pretence of buying land for the Central Stockyards and fitting them up—commenced fictitious suits to enforce pretended rights—placed grossly exaggerated prices on the property included in the contract, all for the purpose of procuring and giving a discrimination in trackage and depot rates in favor of the Non-Associate Packers, which it would be unlawful to make directly, then it is to be treated as a shift or evasion of the law and under it an unlawful discrimination. But where is the proof of all these charges of fraud? On the value of these properties there is a wide divergence of opinion—it is always so when the value of property present or speculative comes in question. The Associate Packers, whose experience entitles their opinions to respect, are clear in their statement as to the adaptability of the Tolleston property to stockyards and of its great value for such purposes. As before stated, counsel on the argument admitted that the court must find from the evidence that the Associate Packers really intended to move their plants to Tolleston. If so, what ground is there to doubt their good faith in their action as to the Central Stockyards and the commencement of their suits. We have then the condition of affairs referred to before, which confronted the directors of the New Jersey Company and threatened material loss if not ruin to the stockholders, created by *bona fide* action on the part of the Associate Packers, and it results in the contract. What is there left for this charge of evasion to rest on, except that the price is large, and the merest suspicion?

But it is argued that the rebate and discrimination is not alone on the trackage charges, but also on charges for yardage and feed, and that such discrimination is unlawful. To sustain this contention it is claimed that the Chicago Company, so far as its stockyards business is concerned, is charged with a public duty. This is sought to be sustained on the ground that its charter has so blended the franchise to do such business, with that of eminent domain, and the right to maintain a railway, that the public duty attaching to the latter becomes impressed on the former, distin-

guishing it from the case of *Sharp* v. *Whiteside, 19 Fed. Rep. 156*.

It is also claimed that the law is not in Illinois as it is in New Jersey, that a stockyards company is not to be considered as necessarily charged with a public duty. *Delaware, Lackawanna and Western R. R. Co.* v. *Stockyards, 18 Stew. Eq. 50 (45 N. J. Eq.)*; *S. C., on appeal, 1 Dick. Ch. Rep. 280 (46 N. J. Eq.)*. I assume there is no public statute in that state to that effect, as none was pleaded, nor was our attention called on the argument to any such statute, or to any decision of its courts to establish the position.

Without entering into the discussion of the question, we may assume for the sake of the argument that the position is correct. The only result is that then the Chicago Company is to be considered as charged with the common law obligation with reference to corporations which owe a duty to the public. Several cases have been cited in this connection, notably that of the *Stock Exchange* v. *Board of Trade, 127 Ill. 153*.

But I do not understand that any stricter rule is imposed on such a corporation by the principles of these decisions, than that the company is bound to furnish all persons alike with its facilities, charging to each person a similar price for similar services under like circumstances. But this contract does not propose to deprive anyone of the facilities of the stockyards, or to charge anyone more than another for yardage or food; all are to be treated on an absolute equality. The bill, in so many words, admits this. And counsel is driven to take the position assumed with reference to trackage charges, and establish discrimination with reference to yardage and feed, by the claim that by shift and evasion the equality of charges is only apparent and not real. The provisions of the Illinois statute as to shift and evasion relate to railroad corporations in the exercise of railroad powers. If we admit for the sake of the argument that the Chicago Company, with reference to its stockyards, is charged with public duty and as such must treat all alike, there is nothing in the law which would prevent it from making an independent contract with a customer having no reference to its pub-

lic duties, by which contract some incidental advantages might be secured by such customer. It is very true that equity will brush away devices invented to conceal the real purpose of a transaction, but I know of no rule by which the court would be justified in condemning an otherwise valid contract, made by a *quasi*-public corporation on the ground that by its operation one customer of such corporation might receive some incidental benefit not received by some other. The argument with reference to the decisive effect of the good faith of the transaction applies to this contention with greater force, if possible, than it did to the question of the trackage charges, where unjust discrimination is obnoxious to the positive provisions of the statute. The claim must be with reference to this part of the case, that this arrangement was gotten up between the Associate Packers and the company for the purpose of creating an unjust preference in favor of the Associate Packers against the Non-Associate Packers with reference to the charges for yardage and food. While it is true that in the eye of the law the smallness of the amounts which may be realized from the discrimination cannot affect its legality, it yet becomes of the highest importance to ascertain what will be the net result, when we are endeavoring to ascertain the object which controlled the parties in making the agreements.

The answer of the defendant company says, that the charges and tolls which the Chicago Company collects for yardage and feed of live stock, which formed the principal part of its revenues and income, are not paid by any of the Non-Associate Packers referred to in the bill of complaint, except to a very inconsiderable extent, less than one-fourth of one per cent., but on the contrary thereof are paid by and for account of the shippers and vendors of said cattle.

Mr. Williams, in his affidavit, says, that the business of the Chicago Company consists mainly of the collection of yardage charges upon live stock shipped to Chicago for sale there—a small portion of the yardage charges is paid upon live stock owned by, or consigned direct to, some of the packing establishments, but,

Willoughby v. Chicago Junction Railways &c. Co.

·" to the best of my knowledge and belief, of such live stock owned by, or con-.signed direct to, such packing establishments in Chicago, over ninety-five per cent. belong to Armour & Company, Swift & Company and Nelson Morris & Company. Excluding yardage charges upon live stock so owned by these packers, it is the fact that less than one-half of one per cent of the total yardage collected per annum, from live stock, at the yards of the Chicago Company, would represent charges upon live stock owned by, or consigned to, any of the other packers. The charge for yardage has always been, and in all instances the same, except that the charge for sheep has for several years been five cents per head, instead of eight cents, as in former years. These yardage charges and the incidental charge for feed are paid by the shippers and sellers, . and not by the packers or other purchasers outside the yards."

This yardage charge varies for the different kinds of live stock, running from twenty-five cents a head for cattle to five cents a head for sheep. As nearly as I can estimate it, from the few figures furnished in the mass of affidavits, the gross income from yardage in the year 1891 was $1,093,913.93, of which only $74,164 represented yardage on cattle consigned to the Associate Packers, and only $7,256.94 the yardage on live stock shipped to or by the Non-Associate Packers.

Although I am not able to ascertain the exact number and character of the live stock consigned direct to the packers, it would appear from the briefs of counsel as filed, ascertained, I suppose, from some of the papers in the case, that during the year 1891, there was paid to the Chicago Company for feed for live stock consigned direct to the Associate Packers the sum of $36,064.72 and for feed for live stock consigned direct to the Non-Associate Packers $4,257.75, but not being able to ascertain the gross amount received for · feed, I am unable to state what proportion these amounts bear to the whole amount realized, but presume that it is about in the same proportion as the difference between the amounts received for yardage.

The most casual consideration of these results demonstrates how small a figure the contributions of the packers cut in the receipts of the company for yardage and feed, which it is admitted on all hands is the chief· source of revenue of the company.

It is stated as deducible from the figures introduced, that the total of yardage charges during the last year, paid by all of the

Willoughby v. Chicago Junction Railways &c. Co.

twelve Non-Associate Packers, was $3,989, as compared with the total yardage of $1,639,138, or less than one-quarter of one per cent. of the gross income from yardage.

The amount paid for yardage by all the packers, Associate and Non-Associate, was $78,153, or less than five per cent. of the gross yardage. Four of the Non-Associate Packers paid no yardage at all, one paid fifty cents, another $58, and another $108.

It is almost absurd to consider a claim that the arrangement between these parties in all its different phases, and involving its vast interests, was gotten up as a shift to hide the real purpose of creating a preference against the parties, who contributed, some of them nothing, and the most of them such infinitesimal amounts as to be inappreciable.

I confess that I have given this extended consideration to the different phases of this objection of unjust discrimination, more out of deference to the eminence and zeal of counsel who have presented it, than to any apprehension either of importance or of difficulty which it might involve, and must say that study and consideration have only more clearly demonstrated how unsubstantial, and irrelevant to this case, the whole question, as developed by the evidence, appears to be, and that I find nothing which would warrant the court in holding this contract invalid as creating or providing for an unlawful discrimination.

It is next insisted, but not very seriously pressed, that this agreement is in violation of the Interstate Commerce act. *Sup. Rev. Stat. (2d ed.) p. 529 folio 1, February 4th, 1887.* The Interstate Commerce act sought to apply to commerce between the states the same ideas and purposes, so far as discrimination is concerned, as are developed by the Illinois statute heretofore quoted. This agreement is sought to be brought within the provisions of that act by the allegation and fact that a part, at least, if not the greater portion of the live stock received at the yards of the Chicago Company is brought from states other than Illinois, and that the product of the establishments at Packington transported over the railroad owned by the Chicago Company is carried by connecting lines to points outside of the same state. What has

Willoughby v. Chicago Junction Railways &c. Co.

been said with reference to the question of freight, in considering the matter in connection with the Illinois statute, applies with equal force to this contention, and establishes that it is without merit.

It is next insisted that this contract is void as against the provisions of the act of congress of April 2d, 1890, called the Sherman act; but I fail to see wherein this agreement falls within any of the provisions of that law.

The supplemental bill challenges the right of the New Jersey Company to make payment in the manner provided for in the agreement of January 15th, 1892. That provides for the payment of the consideration in income bonds of the company dated July 1st, 1891, and payable July 1st, 1897, with interest semi-annually on the first days of January and July, at such rate, not exceeding five per cent. per annum, as the net surplus income of the company shall suffice to pay—said interest to be payable only out of the net income of the company after paying its present fixed charges on its issue of collateral trust bonds, its current expenses, and the six per cent. cumulative dividends on its preferred stock, but before its common stock is paid any dividend. Such interest to be payable out of the net income of the year only, and not to be cumulative. After paying out of its net income its present fixed charges, current expenses and six per cent. dividend on preferred stock, there is to be set aside semi-annually, the sum of $100,000, if there is sufficient net income so to do, or if insufficient, so much as there may be, but this provision not to be cumulative. This semi-annual reserve to be applied, first, to provide interest for the current half year on the income bonds outstanding; second, the balance, if any, for the purpose of redeeming the income bonds at par, or in the purchase of said bonds for cancellation. The eleventh paragraph of the agreement gives the company the option to deliver to the Associate Packers shares of its common stock at par, in lieu of any or all of its income bonds. The supplemental bill charges that the New Jersey Company has no right or power, under its charter, in consideration of the covenants entered into by the Associate Packers, in and by said agreement, or upon any other consideration,

to issue and deliver to said Associate Packers, its income bonds or its common stock in lieu of income bonds, or otherwise, or any part thereof, for the purchase of the land at Tolleston or the Central Stockyards, or for any other of the purposes or considerations mentioned in said agreement. Again, that the New Jersey Company has no right or power to issue obligations, or its stock, or to pay out its funds for any purpose in said agreement mentioned. By section third of the certificate of organization of the New Jersey Company, stating the objects of its incorporation and specifying the powers thereof, we have the following : " to issue bonds and to secure the same by a pledge or deed of trust of or upon any part of said shares, or any other property held or owned by the company, and to sell or pledge such bonds for proper corporate purposes." If the company has the power and authority to make this contract, its power to issue bonds in payment of the consideration would seem to be ample—whether such bonds shall be ordinary bonds, or income bonds, or simple debentures, is a matter of corporate regulation and management, with which the courts will not interfere. It is difficult, however, to see how a stockholder can be affected by the fact that these bonds are income bonds, not cumulative—for they cannot affect the preferred stock or its dividend, and if the holder of common stock prefers them, he has opportunity to exchange his stock for such bonds, for by the circular annexed to the supplemental bill as *Exhibit B*, being a circular issued by the company to its stockholders calling a special stockholders' meeting to consider the agreement, it is stated that the directors propose by virtue of the said option to offer to any holders of common stock, so desiring, the privilege of exchanging their stock at par, for such income bonds to the total amount of the issue, and the stock so obtained, in case any of the stockholders shall elect to make the exchange, will be delivered in lieu of the bonds.

By a stipulation of the parties filed in the cause, it is provided, that the hearings had in the suit upon the motion for a preliminary injunction, shall be considered as if had upon final hearing upon bill and supplemental bill, answers, replications and proofs, that the affidavits submitted by the parties, complainant and de-

fendant, shall have the same force and effect, as if the affiants had been duly examined and cross-examined as witnesses, subject to legal objections as to relevancy and competency; that upon the decision of said vice-chancellors a decree as upon final hearing in conformity with any such decision may be entered by any of the parties, without prejudice to any rights of due and timely appeal by any party &c.

In pursuance of this stipulation, I will advise that the orders to show cause hereinbefore issued be discharged, and that the bill and supplemental bills be dismissed, with costs to be taxed.

VAN FLEET, V. C.

As I heard this cause with Vice-Chancellor Green, at his request, and as I have considered the questions discussed and decided by him in the foregoing opinion, it is proper that I should state that I fully concur both in his reasoning and conclusions.